[Civ. No. 23782. Fourth Dist., Div. Two. Oct. 14, 1981.]

MIDDLESEX INSURANCE COMPANY, Plaintiff and Appellant, v.
JOSEPHINE A. MANN, as Executrix, etc., Defendant and Respondent.

COUNSEL

Barger & Wolen, Oakley C. Frost, Thomas B. Ackland and Steven H. Weinstein for Plaintiff and Appellant.

Nossaman, Krueger & Marsh and James C. Powers for Defendant and Respondent.

## OPINION

KAUFMAN, J.—Middlesex Insurance Company (Middlesex) appeals from a judgment entered in favor of defendant Josephine A. Mann, as executrix of the estate of Logan P. Mann,[1] in its action against Mann and several other defendants seeking, inter alia, damages for breach of fiduciary duty, an accounting and imposition of a constructive trust. For convenience Logan P. Mann will be referred to as Mann and Josephine A. Mann as executrix will be referred to as the executrix. All statutory references will be to the Insurance Code unless otherwise specified.

### Facts

Middlesex is a Massachusetts corporation licensed to do insurance business in California through its managing general agent, Commercial National Security Service, Inc. (CNSS). At all times relevant to this litigation, Multiple Insurance Service (Multiple) was a California corporation[2] engaged in selling fire, casualty and surety insurance policies principally to franchised automobile dealers. Under a 1969 agency agreement with CNSS, Multiple agreed to sell insurance policies issued by Middlesex, to collect all premiums on the policies it sold, to deduct commissions from the gross premiums and to remit the balance to CNSS. Multiple was not required to remit the balance of premiums until 45 to 60 days after collection. In the interim, commonly referred to as "the float," Multiple would deposit the premium payments it received into a trust account and thereafter pay to Middlesex the amounts due it and transfer sums from the amounts due as commissions into its operating account.

Prior to May 7, 1973, Mann was a director, the president and sole shareholder of Multiple; the named transactor through whom Multiple

---

[1]During the course of litigation, Logan Mann died and Josephine Mann, as executrix of his estate, was substituted as a defendant.

[2]At an earlier date Multiple was a partnership.

was licensed to engage in the insurance business,[3] and the sole signatory on Multiple's trust account. On May 7, as a result of a settlement in a lawsuit between Mann and Joseph P. Cefaratti, Mann sold all his stock in Multiple to Cefaratti of California, Inc., a corporation newly formed by Cefaratti for purposes of the transaction. Cefaratti also owned Cefaratti Insurance Agency of Arizona, an Arizona corporation, which sold policies issued by Middlesex in Arizona under a contract with CNSS similar to that of Multiple.

Under the agreement for the purchase and sale of Multiple, Mann received $175,000 as consideration for the sale of stock and was to receive $600,000 payable in installments for an agreement not to compete for three years. He was appointed vice president, chief executive officer and director of Multiple at a salary of $80,000 per year until the balance of the purchase price was paid. Mann was to be "the custodian of all funds" until the "buy-out was completed." He therefore continued to be the sole signatory on the trust account. Mann was also given a power of approval on any expense in excess of $1,000 incurred or paid by Multiple.

After the sale, Multiple and Cefaratti of California merged and continued to do business under the name of Multiple. Although Multiple did not merge with Cefaratti Insurance Agency of Arizona, after Cefaratti's purchase of Multiple the two corporations were operated as a single entity in some respects. The expenses of both corporations were paid out of Multiple's operating account. Checks on the operating account were signed in Arizona by Cefaratti and in California by Mann. To cover the greatly increased expenditures from Multiple's operating

[3]Section 1627 provides in part: "A license is a permit to act in the capacity specified therein. A person licensed is the holder of such license. In case of a license to act as a life agent, insurance agent, or insurance broker issued to an organization, the organization is the holder thereof, but the natural person or persons named thereon are thereby permitted to exercise the agency or brokerage powers of the organization in accordance with and subject to the provisions of this chapter and other applicable law."

Section 1628 provides: "As used in this chapter, an organization is a copartnership, association, or corporation. Where reference is made to a natural person named on an organization license, such reference shall be to a person who is named to exercise the power and perform the duties under an organization license."

Section 1656, subdivision (b), provides: "Every application for a license filed by an organization shall contain:

". . . . . . . . . . . . .

"(b) An agreement by all members of the copartnership, or of an officer empowered to bind the association or corporation, that in the event the applicant is granted the license, only those persons named in the license will transact the insurance authorized under the license."

account more and more money was withdrawn from the trust account and deposited into the operating account.[4] Mann complained to Cefaratti Insurance Agency of Arizona that Cefaratti was spending too much money and reminded Cefaratti of the provision in the purchase agreement limiting Cefaratti's expenditures to $1,000 without Mann's approval.

On about December 18, 1973, Mann and Cefaratti modified the purchase and sale agreement. Under the revised agreement, which was to apply retroactively, the consideration for the stock purchase was greatly reduced; the agreement not to compete was eliminated and all payments were considered payment toward the purchase of the stock; and finally, the provision requiring Mann's approval for expenses over $1,000 was eliminated.

On December 31, 1973, Middlesex ceased issuing policies in California. However, its existing policies remained in force and Multiple continued to collect the premiums due under those policies while also selling policies issued by National Indemnity Company.

Mann continued as the sole signatory on the trust account until January 17, 1974. However, commencing sometime late in 1973, the premiums received in California were forwarded to Arizona at Mann's direction rather than deposited into the trust account. In Arizona, the premiums were deposited into a single account with funds of Cefaratti Insurance Agency of Arizona, and all expenses of both corporations were paid from that account.

As of January 17, 1974, Multiple had paid Middlesex the amount of premiums collected more than 45-60 days earlier. However, Multiple made no further payments to Middlesex after January 1974, though it

---

[4]Prior to May 7, 1973, Multiple withdrew on the average of $15,000 to $20,000 per month from its premium trust account for deposit in its operating account. After Cefaratti's purchase of Multiple, the amounts withdrawn from the trust account were greatly increased as reflected in the following figures:

| | |
|---|---|
| May 1973 | $ 20,000 |
| June 1973 | $ 45,000 |
| July 1973 | $ 20,000 |
| August 1973 | $ 50,000 |
| September 1973 | $118,400 |
| October 1973 | $125,000 |
| November 1973 | $ 75,000 |
| December 1973 | $ 95,000 |
| January 1 through 17, 1974 | $ 59,500 |

continued to collect some premiums on Middlesex policies. Mann resigned as an officer and director of Multiple on or about November 18, 1974.

In September 1974, the general counsel of Middlesex met with Joseph Cefaratti in Arizona to discuss the overdue premiums. At that meeting, Cefaratti admitted owing approximately $1 million and stated that he had used the money to make payments to Mann under the purchase agreement and to pay other expenses. It was agreed that an audit would be undertaken to determine the amount owing. Three months later, in January 1975, following the audit and several meetings between representatives of Middlesex and Cefaratti, the parties agreed that the total amount owing was $1.128 million; whereupon Cefaratti, Multiple and Cefaratti Insurance Agency of Arizona executed a promissory note in that amount in favor of Middlesex. However, no payments were ever received by Middlesex on the promissory note.

Middlesex then instituted the present action against Cefaratti, Mann, Multiple, and Cefaratti Insurance Agency of Arizona. In counts one through four, Middlesex sought recovery against Cefaratti, Multiple and Cefaratti Insurance Agency of Arizona of the $1.128 million due under the promissory note. Counts five and six were directed against Cefaratti and Mann and sought damages for breach of fiduciary duty, an accounting and imposition of a constructive trust. Cefaratti, Multiple and Cefaratti Insurance Agency of Arizona stipulated to entry of judgment against them in the amount of the promissory note. The action thus proceeded to trial against Mann on the fifth and sixth counts.

Neither Middlesex nor Mann timely demanded a jury trial. Belatedly, Mann requested a jury trial which the trial court granted. A jury was empaneled and the case proceeded to trial. After both sides rested, Middlesex requested the court to give 50 special jury instructions relating to the issue of Mann's liability on account of alleged breach of fiduciary duty. The court, however, concluded that the evidence would not support a finding that Mann owed Middlesex a fiduciary duty and, therefore, declined to give the requested instructions. Deeming the remaining issues to be essentially equitable in nature, the court submitted special interrogatories to the jury for an advisory verdict on the question whether Mann had received premium funds which he kept for his own use. The jury answered the interrogatories in the negative and the court adopted the jury's advisory verdict.

Insofar as is pertinent, the court found: "5. Logan P. Mann did not receive any premium funds belonging to Middlesex which he kept for his own use," and "6. While he was employed by Multiple after May 7, 1973, Logan P. Mann received regular payments of salary and reimbursement for expenses. Logan P. Mann also received payments for the sale of his stock in Multiple. All such payments were received by Logan P. Mann in good faith and for value without notice, actual or constructive, that any such funds belonged to Middlesex." Based upon these findings, the court concluded that Mann was not a constructive trustee of Middlesex and that Mann incurred no liability by reason of any failure by any other person to remit money to CNSS or Middlesex or by misappropriation of such funds by any other person or on any other basis. Accordingly judgment was entered in favor of Mann.

### Contentions and Discussion

The substantive issues on appeal have been blurred and indeed the entire appeal has been distorted by a controversy between the parties as to whether or not Middlesex was entitled to a jury trial. Middlesex's primary contention is that it was reversible error for the trial court to refuse to submit to the jury its claim for damages against Mann for breach of fiduciary duty. It asserts the rule that a litigant is entitled to have the jury properly instructed on every theory of liability within the scope of the pleadings as to which there is evidence sufficient to support its position. It also contends that in testing the propriety of the court's refusal to submit to the jury its claim based on Mann's alleged breach of fiduciary duty, the evidence must be viewed in the light most favorable to it.

In urging affirmance of the judgment, the executrix contends that Middlesex was not entitled to jury trial because it had waived its right by failing to timely request jury trial; that the cause of action for breach of fiduciary duty was equitable in nature and that Middlesex was not therefore entitled to jury trial; that, in any event, both the jury, by advisory verdict, and the court determined that Mann did not breach any fiduciary obligation to Middlesex because "Mann did not receive any premium funds belonging to Middlesex which he kept for his own use"; that, viewed most favorably to the executrix, there is substantial evidence to support the court's determination; and that if there was any error in the court's refusing to submit to the jury Middlesex's claim against Mann based on alleged breach of fiduciary duty, Middlesex was not prejudiced and reversal is not therefore warranted. Executrix also

urges that under the applicable law there is no substantial evidence that would support a finding of fiduciary duty of Mann to Middlesex, but, of course, the evidence referred to by the executrix is that viewed most favorably to her.

We conclude that the contention that Middlesex was not entitled to jury trial is incorrect; that the dispositive question on appeal is whether there was substantial evidence that would have supported a determination by the jury that Mann owed and breached a fiduciary duty to Middlesex; that in resolving that question the evidence must be viewed in the light most favorable to Middlesex; and that, so viewed, there was, under the applicable law which we shall explicate, evidence entitling Middlesex to go to the jury. Accordingly, the judgment will be reversed.

■ The assertion of executrix that Middlesex waived the right to jury trial by failing to timely request a jury is factually correct but legally erroneous. That is, Middlesex did not make a timely request for jury trial and, in fact, opposed the belated defense request for jury trial, but Middlesex did not thereby forever waive its right to jury trial. Jury trial was belatedly requested by the defense and the request was granted; the jury was empaneled and the evidence fully presented with the accoutrements of a jury trial. A trial cannot be a jury trial as to one party and a court trial as to the other; once jury trial has commenced, the jury may not be dispensed with at the instance of the party who requested it without affording the other party or parties an opportunity to demand that the trial proceed as a jury trial. (Code Civ. Proc., § 631, subd. 8.)

The contention of the executrix that the cause of action for breach of fiduciary duty was essentially equitable so that Middlesex was not entitled to a jury trial of that cause in any event is similarly inefficacious. Not only was there no objection at trial on that basis, the defense specifically sought and was granted a jury trial as to the cause based on breach of fiduciary duty. Executrix may not therefore assert for the first time on appeal that jury trial was improper *ab initio*.

■ If, therefore, there was evidence that would have supported a recovery on the theory of breach of fiduciary duty, the trial court prejudicially erred in refusing to give at least some of the proffered instructions. "It is hornbook law that each party to a lawsuit is entitled to have the jury instructed on all of his theories of the case that are supported by the pleadings and the evidence. It is incumbent upon the

trial court to instruct on all vital issues involved." (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]; *Bolen* v. *Woo* (1979) 96 Cal.App.3d 944, 952 [158 Cal.Rptr. 454]; see also *Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 543-544 [138 Cal.Rptr. 705, 564 P.2d 857].)

Executrix's contention that the error must be considered nonprejudicial in view of the jury's advisory verdict and the determinations made by the trial court in respect to the cause of action for constructive trust is unmeritorious. Assuming the doubtful proposition that the doctrine of prejudicial error is applicable to the erroneous refusal of a court to submit a cause to the jury, the jury's determination that Mann did not receive any premium funds which he kept for his own use was not dispositive of the claim of breach of fiduciary obligation and, in any event, was made without benefit of appropriate instructions with respect to fiduciaries and their obligations. The court's determination was based upon the erroneous conclusion that there was no legal basis upon which Mann could be found to have owed Middlesex any fiduciary duty.

■ Middlesex is also correct as to the appropriate standard for reviewing the evidence on appeal. Where a party claims to have been erroneously denied requested instructions relating to a theory of the case, in testing the propriety of the court's refusal to instruct a reviewing court must view the evidence and all inferences that may be drawn therefrom in the light most favorable to the claiming party. (*Bonebrake* v. *McCormick* (1950) 35 Cal.2d 16, 19 [215 P.2d 728]; *Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 634 [128 Cal.Rptr. 807, 91 A.L.R.3d 1].)

■ Middlesex asserts there was evidence that there were premiums received by Multiple in California and deposited in Multiple's trust account in the 45 to 60 days preceding January 17, 1974, the date on which Mann ceased to be the sole signatory on the trust account, that were not paid over to Middlesex and contends that Mann was a fiduciary with respect to those premiums and had a fiduciary obligation to see that the portion of those premium payments due Middlesex were paid to it. It is further contended there was evidence that premiums were received by Multiple on Middlesex policies after January 17, 1974, and that Mann had a fiduciary obligation to see that those funds were deposited into a trust account and that the portion due Middlesex was paid to it. Middlesex urges that Mann's directing the premiums to Arizona, with knowledge of Cefaratti's persistent profligacy would have

supported a determination by the jury that Mann breached his fiduciary obligations.

Viewing the evidence most favorably to Middlesex, we agree there is substantial evidence to support its factual assertions. We also agree that if the trier of fact found the facts to be as asserted, Mann would have breached his fiduciary obligations with respect to the premiums received by Multiple in California.

Middlesex asserts three distinct theories on which it urges the evidence would have supported a determination that Mann was a fiduciary with respect to the premiums received by Multiple in California: (1) under sections 1733 and 1734 of the Insurance Code which impose fiduciary duties on insurance agents who receive premium payments; (2) under the so-called *Knoblock* theory that a managing officer-director of a corporate trustee is liable to the trust beneficiary if, with his knowledge or reason to know, the trust property is wrongfully utilized for corporate purposes (*Knoblock* v. *Waale-Camplan Co.* (1956) 141 Cal. App.2d 870, 872, 874 [297 P.2d 765]); and (3) by an asserted rule of general corporate law that one who is a managing officer and director of a corporation is personally liable to another whose money or property has been misappropriated or converted when the officer-director has participated or acquiesced in the misappropriation with knowledge of the misappropriation or conversion or charged with knowledge because of widely known company practices. We agree that a breach of fiduciary duty by Mann could be posited on two of these three theories.[5] The third theory, to the extent it is distinct from the second, is not based on fiduciary principles but, rather, the law governing the liability of corporate directors and officers for torts of their corporation, a theory of liability not encompassed by the pleadings.

Section 1733 reads in relevant part: "All funds received by any person acting as an insurance agent, broker or solicitor ... as premium or return premium on or under any policy of insurance ... are received and held by such person in his fiduciary capacity. Any such person who diverts or appropriates such fiduciary funds to his own use is guilty of theft and punishable for theft as provided by law."

[5]Middlesex also contends that there is evidence that Mann was its subagent or that he voluntarily assumed a confidential relationship with it. Multiple might have been a subagent, but we see no substantial evidence that Mann was Middlesex's subagent, nor do we find evidence that apart from his obligations as the named transactor on Multiple's license and as a managing officer and director of Multiple, that Mann entered into a confidential relationship with Middlesex.

As amended in 1972, section 1734, application of which was expressly limited to "any person licensed ... to act in any of the capacities specified in Section 1733," provided in substance that all premiums received by the licensee not remitted "by him to the insurer or the person entitled thereto within fifteen (15) days after the receipt thereof" must be deposited "in a trustee bank account or depository separate from any other account or depository, ... for the account of [the persons entitled thereto]."[6] (Stats. 1972, ch. 353, § 1, pp. 665-666.)

Executrix points out that sections 1733 and 1734 do not specify a civil remedy, and relying upon *Swickheimer v. King* (1971) 22 Cal. App.3d 220 [99 Cal.Rptr. 176], she urges that a violation of these sections does not give rise to civil liability. She further urges that the only conduct statutorily proscribed is the appropriation of premium funds to one's own use. We do not agree.

In *Swickheimer* the question was raised whether violation of either of sections 7068.1 or 7122.5 of the Business and Professions Code, relating to the conduct of the responsible managing employee of a licensed corporate contractor, should give rise to a cause of action for damages. The court observed that both sections appeared to impose an absolute responsibility upon the responsible managing employee (22 Cal.App.3d at p. 224) and relied on that fact in declining to recognize a civil cause of action based on violation of those regulatory provisions. The court stated in pertinent part: "In their closing brief, plaintiffs ... [argue] that even if the Business and Professions Code sections are disciplinary in nature, they may still be used as a basis for civil liability. Plaintiffs cite Prosser on Torts (3d ed. 1964), page 191, as authority for the proposition that '[w]hen a statute provides that under certain circum-

---

[6]Insofar as it is here applicable, section 1734 as presently amended is the same in substance. It reads in relevant part: "This section applies to any person licensed, whether under a permanent license, restricted license, temporary license, or certificate of convenience, to act in any of the capacities specified in Section 1733. If fiduciary funds, as defined in Section 1733, are received by such person, he shall [¶] (a) Remit premiums, less commissions, and return premiums received or held by him to the insurer or the person entitled thereto, or [¶] (b) Maintain such fiduciary funds on California business at all times in a trustee bank account or depository in California separate from any other account or depository, ... for the account of such persons [the persons entitled thereto].... However, such person may commingle with such fiduciary funds in such account or depository such additional funds as he may deem prudent for the purpose of advancing premiums, establishing reserves for the paying of return commissions or for such contingencies as may arise in his business of receiving and transmitting premium or return premium funds...." (Stats. 1980, ch. 1300, § 1, p. 4391.)

stances particular acts shall or shall not be done, it may be interpreted as fixing a standard for all members of the community, from which it is negligence to deviate.' However, plaintiffs have overlooked the fact that the author goes on to note certain exceptions to this rule, as where the Legislature has enacted a statute which provides for strict liability and which imposes an absolute duty for whose violation there is no recognized excuse. (Prosser on Torts (3d ed. 1964) pp. 198-199.) In the instant case, as noted above, defendant King could be held to have violated only those two Business and Professions Code sections which imposed strict liability." (22 Cal.App.3d at p. 226.)

Here, by contrast, the statutory provisions are not wholly penal or regulatory; the only conduct that is made criminal is the appropriation of premium funds to one's own use. Otherwise, the statutory provisions simply proclaim that funds received as premium payments by a licensee are received in a fiduciary capacity and, if not transmitted to the insurer or person entitled thereto within the time prescribed, must be deposited in a trust account or depository for the account of the person entitled thereto. Nor do the statutory provisions impose strict or absolute responsibility; they establish only fiduciary obligations which, although stringent, are not absolute.

The fiduciary obligations described in sections 1733 and 1734 were designed to effectuate a public policy of protecting both insurers and policyholders from the mishandling and dissipation of premium payments. (See § 1734; *People* v. *Hedderly* (1954) 43 Cal.2d 476, 480 [274 P.2d 857]; *Walter J. Warren Ins. Agency* v. *Surpur Timber Co.* (1967) 250 Cal.App.2d 99, 104-105 [58 Cal.Rptr. 143].) With respect to these statutes, the appropriate rule is the general rule stated in Restatement Second of Torts, section 874A: "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." (Accord: *Wetherton* v. *Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168, 174 [79 Cal.Rptr. 543]; cf. *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 763 [91 Cal.Rptr. 745, 475 P.2d 465]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 7, pp. 2307-2308.) A civil remedy against licensees responsible for the misapplication or dissipation of premium payments will best effectuate

the purpose of sections 1733 and 1734. We conclude that a civil action will lie for damages proximately resulting from a licensee's breach of the fiduciary obligations imposed by those sections.

■ Executrix also contends that the fiduciary duties imposed by sections 1733 and 1734 fell upon Multiple, not upon Mann. Executrix points out that Mann was only the named transactor on the license; that Multiple is actually the holder of the license. (§ 1627, see fn. 3, *ante.*) She argues that any number of natural persons may be named as transactors on the insurance license of an organization and that it is ridiculous. to suggest that every one of those natural persons would be responsible for any premium funds he or she happened to receive on the organization's behalf even after he transmitted them to other officers or employees over whom he or she had no control. It is asserted: "There is simply nothing in any of these sections which makes natural persons named on a corporation's license responsible for premium funds after those funds have been turned over to other officers or employees of the corporation." Middlesex argues that Mann could not avoid his fiduciary obligations under sections 1733 and 1734 by simply transmitting the premium funds to another officer of the corporation, especially when the evidence indicated that Mann knew that the other officer had rather consistently been paying out of such funds operating expenses of the corporation or expenses of his own in excess of earned commissions.

We agree with Middlesex. Section 1733 applies to any person who receives premium payments while acting as an insurance agent, whether licensed or not. (*People* v. *Hewitt.* (1975) 53 Cal.App.3d 759, 763-765 [120 Cal.Rptr. 20].) While the applicability of section 1734 is limited by its own language to licensees, section 1684 expressly states: "Except as otherwise provided in this article, . . . wherever reference is made to a person who has been licensed in a specified capacity, *such reference shall also apply to a person named to act in such capacity under the license of an organization.*" (Italics added.) Thus, the code imposes on a named transactor fiduciary obligations with respect to the premiums received by his organization. If Mann was unwilling to be responsible for Cefaratti's handling of the funds when they were transmitted to Arizona, he should not have been acting nor should he have continued to act as the named transactor on Multiple's license.

Unfortunately, our conclusion that Middlesex's cause of action against Mann for breach of fiduciary duty should have gone to the jury on the statutory violation theory does not relieve us of the responsibility

of determining whether the cause should also have been submitted to the jury on Middlesex's other two theories, because a party is entitled to have his case considered by the trier of fact on all tenable legal theories within the purview of the pleadings. We conclude that the cause should have been submitted to the jury on the so-called *Knoblock* theory but that the asserted rule of general corporate law that a managing officer-director of a corporation is personally liable for misappropriations or conversions in which the officer-director participated or acquiesced with knowledge or reason to know of the wrong is, to the extent it is distinct from the *Knoblock* theory, not based on the law relating to fiduciaries and was therefore not within the purview of Middlesex's complaint.

■ The decision in *Knoblock* v. *Waale-Camplan Co., supra*, 141 Cal. App.2d 870, at pages 872, 874, is generally cited for the proposition that a managing officer-director of a corporate trustee individually bears a fiduciary duty to the beneficiary of the trust and is liable to the beneficiary for conversion of the trust property to the use of the corporation of which he knew or in the exercise of his fiduciary duties should have known. (See also Civ. Code, § 2230;[7] cf. *Granoff* v. *Yackle* (1961) 196 Cal.App.2d 253, 256-257 [16 Cal.Rptr. 394]; *Crenshaw* v. *Roy C. Seeley Co.* (1933) 129 Cal.App. 627, 632 [19 P.2d 50]; *McClory* v. *Dodge* (1931) 117 Cal.App. 148, 152-154 [4 P.2d 223]; *Mercer* v. *Dunscomb* (1930) 110 Cal.App. 28, 32-35 [293 P. 836]; *Vujacich* v. *Southern Commercial Co.* (1913) 21 Cal.App. 439, 442-443 [132 P. 80].) Here, there is no question but that Multiple received the premium funds in a fiduciary capacity (§ 1733) nor but that Mann as Multiple's named transactor and an officer and director of Multiple was a managing officer-director of Multiple. The question whether Mann's failure to see that the premiums received in the 45-60 days preceding January 17, 1974, were paid over to Middlesex and his failure to deposit premiums thereafter received into the trust account and his forwarding those premiums to Cefaratti in Arizona with knowledge of Cefaratti's profligacy constituted a breach of fiduciary duty should have gone to the jury. Executrix asserts that the evidence establishes that Mann had no knowledge of any improper use of the funds sent to Arizona, but that assertion is based on a view of the evidence most favorable to her, contrary to the view of the evidence we must take on appeal. Moreover, actual knowledge of misappropriation is not a pre-

---

[7]With exceptions not here pertinent, Civil Code section 2230 provides: "Neither a trustee *nor any of his agents* may take part in any transaction concerning the trust in which he or anyone for whom he acts as agent has an interest, present or contingent, adverse to that of his beneficiary, ..." (Italics added.)

requisite to liability on this theory. Under sections 1684, 1733 and 1734 Multiple and Mann were in essence cotrustees of the premiums received in California. While a trustee is not strictly liable for the wrongful acts of a cotrustee, a trustee is responsible for the wrongful acts of a cotrustee to which he consented, or which, by his negligence, he enabled the cotrustee to commit. (Civ. Code, § 2239; *Blackmon* v. *Hale* (1970) 1 Cal.3d 548, 559-560 [83 Cal.Rptr. 194, 463 P.2d 418], and cases there cited.)

The assertion by the executrix that the *Knoblock* theory was not presented in the trial court is contradicted by the record. Paragraph 24 of Middlesex's complaint alleged: "MIDDLESEX is informed and believes and thereon alleges that defendants and each of them [Cefaratti and Mann], breached their fiduciary obligation to MIDDLESEX by allowing defendants, their associates and *corporations which they and/or their associates control*, to receive from MULTIPLE ... [premium] moneys in a total sum exceeding One Million One Hundred Twenty-Eight Thousand Dollars ...." (Italics added.) In argument as to whether or not the requested fiduciary relation instructions should be given, the trial court concluded the pleadings were not sufficiently broad to encompass the *Knoblock* theory and asked whether the parties felt it was too late for an amendment to the complaint to assert liability on that theory. Counsel for Middlesex requested that the complaint be so amended, and defense counsel stated that there was no objection to such amendment. Whether or not any such amendment was subsequently made or whether the pleadings were deemed amended we are not informed. That is of little significance, however, because we do not agree with the trial court that the pleadings were insufficient to encompass the *Knoblock* theory. The language of paragraph 24 quoted above was sufficiently broad to encompass that theory and some instructions pertaining to that theory were properly requested.

In support of its assertion that under the general law relating to corporations an officer-director is liable for misappropriation of property of a third person in which the officer-director acquiesced with knowledge or charged with knowledge because of widely known company practices, Middlesex cites such cases as *Granoff* v. *Yackle, supra,* 196 Cal.App.2d 253, *McClory* v. *Dodge, supra,* 117 Cal.App. 148, *Mercer* v. *Dunscomb, supra,* 110 Cal.App. 28, and *Vujacich* v. *Southern Commercial Co., supra,* 21 Cal.App. 439. It is certainly true that the opinions in almost all of the cited cases presumed actual knowledge of the conversion or misappropriation from widely known company practices. However, we read

those decisions as being essentially the same as *Knoblock*, that is, that the property misappropriated or converted was held by the corporation as a trustee, either voluntarily or involuntarily (see Civ. Code, §§ 2223, 2224; *Bridgford* v. *McAdoo* (1920) 48 Cal.App. 305, 306-307 [191 P. 1113]). Alternatively, they must be taken as illustrative of the general rule of corporate and tort law that an officer-director may be liable for a tort of his corporation which he authorized or in which he knowledgeably participated or, perhaps, acquiesced (see *Teledyne Industries, Inc.* v. *Eon Corporation* (S.D.N.Y. 1975) 401 F.Supp. 729, 736-737, and authorities there cited, affd. (2d Cir. 1976) 546 F.2d 495). That was the evaluation of such cases made by the court in *Thomsen* v. *Culver City Motor Co., Inc.* (1935) 4 Cal.App.2d 639 [41 P.2d 597], concluding that the knowledge from widespread company practices spoken of in several of the cited cases was a specie of actual knowledge. (*Id.*, at p. 645.)

As stated by the court in *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586 [83 Cal.Rptr. 418, 463 P.2d 770]: "Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done. They may be liable, under the rules of tort and agency, for tortious acts committed on behalf of the corporation. [Citations.] They are not responsible to third persons for negligence amounting merely to nonfeasance, to a breach of duty owing to the corporation alone; the act must also constitute a breach of duty owed to the third person. [Citation.]" (*Id.*, at p. 595; accord: *Thomsen* v. *Culver City Motor Co., Inc.,* · *supra*, 4 Cal.App.2d at pp. 644-645.)

Middlesex did not plead the liability of Mann on any theory other than a breach of fiduciary duty, and trial of the case did not proceed on any theory that Mann was liable for a tort of the corporation. Middlesex did request an instruction concerning the fiduciary duty of a director to his corporation (see Corp. Code, § 309), but personal liability of a director for breach of his fiduciary duty to the corporation is imposed only when the breach has resulted in loss of corporate property, in which case a shareholder or creditor may have an action derived from the rights of the corporation. Here, however, it was the property of Middlesex that was allegedly misappropriated, not that of the corporation, and the fiduciary duty allegedly breached was that owing by Mann to Middlesex, not that owing by Mann to Multiple.

*Disposition*

Middlesex was entitled to have its action submitted to the jury on two of its three theories. The judgment is reversed.

Tamura, Acting P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied November 4, 1981, and respondent's petition for a hearing by the Supreme Court was denied December 23, 1981.