CREDIT MANAGERS ASSOCIATION OF SOUTHERN CALIFORNIA, State Court Receiver for Far West Administrators, Inc., the Compete Association, the Compete Master Trust and Fincomp Insurance Marketing, Inc., Plaintiff-Appellant,

v.

KENNESAW LIFE AND ACCIDENT INSURANCE COMPANY, a Georgia Corporation, Defendant-Appellee.

No. 85–6342.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 1986.

Decided Feb. 5, 1987.

Kent Keller and Gail E. Cohen, Los Angeles, Cal., for plaintiff-appellant.

Douglas L. Hallett, Los Angeles, Cal., for defendant-appellee.

Before SNEED and SCHROEDER, Circuit Judges, and BROWNING *, District Judge.

SNEED, Circuit Judge:

Credit Managers Association (CMA), plaintiff-appellant, is the receiver for four entities that were involved in a program that provided medical care benefits to employees through their employers. Kennesaw Life and Accident Insurance Company (Kennesaw), defendant-appellee, contracted to provide some coverage in connection with these benefits. The precise nature of the coverage is subject to some dispute. CMA, in an effort to restore some measure of liquidity to the entities in receivership, sued Kennesaw on five theories: violation of California Insurance Code section 803, breach of fiduciary duty under the Employee Retirement Income Security Act (ERISA), breach of fiduciary duty under California law, unfair claims practices, and fraud. The district court granted summary judgment to Kennesaw on the first two claims and dismissed the other three claims because CMA did not have standing to assert them. We reverse on the ERISA count and affirm in all other respects.

I.

FACTS AND PROCEEDINGS BELOW

The four entities of which CMA is the receiver are the Continental Organization of Medical, Professional and Technical Employees (COMPETE); the C.O.M.P.E.T.E. Master Trust a.k.a. Continental Organization of Medical, Professional and Technical Employees Trust (COMPETE Master Trust); Fincomp Insurance Marketing, Inc.

(Fincomp); and Far West Administrators (Far West). COMPETE was an unincorporated association of employers that offered a variety of benefits to its members, including medical care benefits for their employees. Far West was a California corporation that administered the COMPETE medical care benefits program. Fincomp was a California corporation that marketed the COMPETE program. On or about February 21, 1981, COMPETE created the COMPETE Master Trust to fund the COMPETE program.

COMPETE operated in the following fashion. It issued certificates of insurance to covered employees that explained the medical care benefits provided. 1 Excerpt of Record (E.R.) item 1, at 479–504. Each covered employee had the choice of either seeking treatment from a member of Far West's Health Panel and paying nothing, or seeking treatment from a health care provider of his choice and paying twenty percent of the charges. There also were deductible amounts for certain treatments. The first alternative, the so-called "Health Maintenance Option," resembled a health care service plan subject to the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act), Cal. Health & Safety Code §§ 1340–1399.64. The second alternative, the so-called "Conventional Option," resembled a group insurance policy subject to the California Insurance Code. Kennesaw, however, may have had a third view. It alleges that at the time it did business with COMPETE, it thought the COMPETE Master Trust was a multiple employer trust, unregulated under California law.

The COMPETE Master Trust procured essentially two policies from Kennesaw. The first was Group Insurance Policy No. 600000001 (the 01 policy), which it was agreed would be retroactive to March 1, 1981. The policy covered only claims exceeding $25,000. Otherwise, it provided

---

* Honorable William C. Browning, United States District Judge for the District of Arizona, sitting by designation.

benefits substantially in accordance with the certificates issued by COMPETE. 1 E.R. item 1, at 153; *cf.* 3 E.R. item 14, at 36–39. The COMPETE Master Trust also procured Group Insurance Policy No. 600000002 (the 02 policy) from Kennesaw, effective July 1, 1981. Coverage under the 02 policy is essentially the same as under the 01 policy, but it is not restricted to claims exceeding $25,000. Kennesaw rolled over employers from the 01 policy to the 02 policy when and if it ascertained that they met Kennesaw's underwriting requirements. Kennesaw later issued Group Policy Nos. 6–0002–CA, –CO, and –ID, retroactive to July 1, 1981, to supersede the 02 policy. These policies will be referred to collectively as the 02 policy. According to Kennesaw, the 01 policy lapsed effective October 31, 1981, due to nonpayment of premiums.

On March 12, 1982, two state agencies intervened. At the instance of the Insurance Commissioner, the Superior Court of California issued a temporary restraining order enjoining Far West, COMPETE, and Fincomp from transacting insurance business without a license. 1 E.R. item 4, exhibit B. On the same day, at the instance of the Commissioner of Corporations, the Superior Court appointed CMA as receiver for COMPETE, the COMPETE Master Trust, Fincomp, and Far West, because they were transacting health care service plan business without a license and were making misrepresentations. *Id.* at exhibits C and D. Thereafter CMA filed an adversary proceeding against Kennesaw in bankruptcy court, but the court abstained from jurisdiction, in part because COMPETE and the COMPETE Master Trust were probably insurers. *Id.* at exhibit E.

CMA filed its complaint in district court on November 14, 1983. It sought to hold Kennesaw liable for all claims under the 01 policy, whether or not they exceeded $25,-000. CMA also asked for punitive damages. Kennesaw has never repudiated the 02 policy, and it continues to pay claims under the 01 policy in accordance with its interpretation of its liabilities thereunder. Kennesaw contests only its liability under the 01 policy for claims less than $25,000. Such claims in the aggregate are very substantial.

## II.

### STANDARD OF REVIEW

The district court granted summary judgment to Kennesaw on two claims and dismissed the remaining three claims for lack of standing. This court reviews an order granting summary judgment de novo. *Gabrielson v. Montgomery Ward & Co.,* 785 F.2d 762, 764 (9th Cir.1986). It also reviews an order of dismissal for failure to state a claim de novo. *Securities Investor Protection Corp. v. Vigman,* 803 F.2d 1513, 1516 (9th Cir.1986).

## III.

### STANDING

A. *Was CMA properly appointed as receiver?*

Kennesaw launches a two-pronged attack against CMA's standing as receiver. First it challenges CMA's authority to sue under the Insurance Code on the ground that the Insurance Commissioner alone may be appointed as receiver of an insolvent insurer. Kennesaw next questions whether any of the entities represented by CMA engaged in business as a health care service plan within the meaning of the Knox-Keene Act. Consequently, it contends that the Commissioner of Corporations did not have the authority to have CMA appointed as receiver for any purpose. The district court evidently accepted these arguments.

■ The Department of Insurance believes that CMA is a proper receiver for the entities it represents, and that the authority of the Insurance Commissioner to act as receiver of insolvent insurers is not exclusive. 3 E.R. item 20, at 102. We agree. It would be unnecessarily complicated to appoint two receivers, both the Insurance Commissioner and someone chosen by the Department of Corporations, when an entity acts both as an insurer and as a health

care service plan. Furthermore, in some cases it might be unclear what type of entity is being placed in receivership. For example, Kennesaw claims to have been ignorant of the COMPETE Master Trust's true character at the time it did business with it. It would be wasteful to abort receivership proceedings in order to change receivers, solely because the courts had decided belatedly to characterize an entity in a different way.

▪ Kennesaw's authority for asserting that only the Insurance Commissioner may be the receiver for an insolvent insurer is not strong. The Insurance Code, with its provision for the Insurance Commissioner serving as receiver, says that it "shall apply to all [insurers]." Cal.Ins.Code § 1010. This language is mandatory, but not clearly exclusive. It does not address specifically a case like the instant one, in which the Insurance Commissioner acquiesces in the appointment of another receiver. Kennesaw refers to many cases in which the Insurance Commissioner, in fact, was appointed as receiver of an insolvent insurer. But only one case suggests that the Insurance Commissioner's receivership authority is exclusive, and the pertinent language in that case is dictum. *Anderson v. Great Republic Life Ins. Co.*, 41 Cal.App.2d 181, 189, 106 P.2d 75, 80 (1940). Kennesaw urges this court to construe California law to conform to New York Law and the Uniform Insurers Liquidation Act, which appear to give the Insurance Commissioner exclusive authority to serve as receiver. We decline to do so.

▪ Even if the Insurance Commissioner's authority to serve as receiver of an insolvent insurer is not exclusive, so that CMA is eligible to serve as receiver, the issue remains whether the Superior Court had the power to appoint CMA. The Superior Court purported to rely on the Knox-Keene Act, which authorizes the Commissioner of Corporations to sue for the appointment of a receiver "[i]n the case of any violation of the provisions of [the Knox-Keene Act]." Cal.Health & Safety Code § 1392(a). Because the Knox-Keene

Act applies only to "health care service plans," Cal.Health & Safety Code § 1343(a), the propriety of CMA's appointment turns on whether the COMPETE program was a "health care service plan." Although the entities CMA represents acted in some respects as an insurer, they also acted as a health care service plan.

This is borne out by California Health and Safety Code section 1345(f), which defines a health care service plan as:

> any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for such services, in return for a prepaid or periodic charge paid by or on behalf of such subscribers or enrollees.

The plain meaning of this definition encompasses ordinary insurance as well as prepaid health care plans. The COMPETE program comfortably falls within it. It is true that section 1343(d)(1) limits the scope of the Knox-Keene Act somewhat by excepting from its coverage "[a] person organized and operating pursuant to a certificate issued by the Insurance Commissioner unless the entity is directly providing the health care service through those entity-owned or contracting health facilities and providers." Cal.Health & Safety Code § 1343(d)(1). None of the entities in receivership, however, had a certificate from the Insurance Commissioner. Therefore, the exception does not exclude them. Furthermore, at least Far West appears to have provided health care service directly through its affiliated division, the Professional Management Group. This activity possibly is attributable to the other entities. For these reasons we conclude that the Commissioner of Corporations was empowered by statute to seek the appointment of a receiver in this case.

▪ This does not end the matter, however. A receiver's powers are derived from the purpose his appointment serves. A court cannot appoint a receiver except as a remedy ancillary to a pending action. 55 Cal.Jur.3d *Receivers* § 2 (1980). Here the "pending action" appears to have been

thought to be bankruptcy. The Knox-Keene Act, it is true, authorizes a receiver to commence a proceeding in bankruptcy, Cal.Health & Safety Code § 1392(c), and this proceeding against Kennesaw could be viewed as a marshalling of assets ancillary to bankruptcy. This possibility does not exist because the bankruptcy court abstained from jurisdiction over CMA. It did this in part because it deemed it likely that COMPETE or the COMPETE Master Trust were insurers. The bankruptcy court then dismissed the action on June 23, 1983. 1 E.R. item 4, at 97–104.

■ By a process of elimination, we are left to infer that CMA's receivership is ancillary to a liquidation under Insurance Code §§ 1010–1062. This is not contradicted by the Superior Court's grant of CMA's powers. That grant included powers "in addition to and not by way of limitation on the powers described in Health and Safety Code Section 1392." 1 E.R. item 4, at 78, 82, 87, 92. Thus, the grant could be construed to confer authority to liquidate under the Insurance Code.

■ This conclusion is novel, because it permits a receiver appointed by the Commissioner of Corporations to enforce the provisions of the Insurance Code. Ordinarily, either the Department of Corporations or the Department of Insurance exercises exclusive jurisdiction over an entity that provides health care benefits. The Insurance Code does not apply to a health care service plan, *California Physicians' Serv. v. Garrison*, 28 Cal.2d 790, 803–11, 172 P.2d 4, 12–17 (1946), nor, presumably, does the Health and Safety Code apply to an insurer. If an entity is partly an insurer and partly a health care service plan, California courts apply the reserve requirements of the Insurance Code to it if "indemnity is a significant financial proportion

of the business." *People ex rel. Roddis v. California Mut. Ass'n*, 68 Cal.2d 677, 683, 441 P.2d 97, 101, 68 Cal.Rptr. 585, 589 (1968). This financial proportion test, and the policy of exclusive jurisdiction that underlies it, are not directly relevant to the receivership issues raised by this case. Rather than formulate another test to apportion jurisdiction between the Departments of Insurance and Corporations in this context, we will accept the solution they worked out by themselves. The Insurance Commissioner acquiesced in CMA's appointment as receiver. We infer that it thereby authorized CMA to enforce the liquidation provisions of the Insurance Code. We find no obstacle in California law to this sharing of responsibilities.[1]

B. *May CMA bring claims on behalf of beneficiaries of the COMPETE program?*

■ CMA's last three claims are for breach of a fiduciary duty under California law, unfair claims practices, and fraud. Ordinarily, an insured would bring these causes of action against his insurer. Because CMA as receiver represents COMPETE and its affiliates, but not the beneficiaries of the COMPETE program, CMA does not have standing to assert these claims. *See Allen v. Ramsay*, 179 Cal. App.2d 843, 849–50, 4 Cal.Rptr. 575, 580 (1960); 55 Cal.Jur.3d *Receivers* § 69 (1980).

CMA alleges that the terms of the COMPETE Master Trust's Declaration of Trust and its administrative services agreement with Far West authorize the COMPETE Master Trust to prosecute claims on behalf of "policyholders or members." Having examined the provisions referred to, we conclude that they do not give CMA the authority it desires. Therefore we affirm

---

1. Legislation that took effect after the events in this case will create a presumption that an entity is subject to the Insurance Department unless it can show otherwise, Cal.Ins.Code § 740; the Commissioner of Corporations will maintain a list of qualified health care service plans and will notify the Department of Insurance of those that do not qualify, Cal.Health & Safety Code

§ 1346.5. Hence the confusion and overlap at the heart of this case are unlikely to recur. Kennesaw infers further that the Legislature never intended the Departments of Insurance and Corporations to have the concurrent jurisdiction that CMA relies on in this case. Kennesaw's inference does not appear compelled by these amendments.

the district court's order insofar it dismisses these three claims.

## IV.

### THE SECTION 803 CLAIM

CMA advances a novel theory according to which Kennesaw, by agreeing to reinsure part of the risk assumed by the COMPETE Master Trust, became liable for the full extent of the coverage promised in COMPETE's certificates of insurance. To affix this liability CMA relies on California Insurance Code section 803, which provides:

> An admitted insurer shall not in any manner assume or reinsure any of the liability of a nonadmitted insurer on insurance upon subject matter located in this state, except in a case where the admitted insurer assumes the entirety of such insurance of the nonadmitted insurer together with all the liabilities arising therefrom.

Kennesaw, CMA points out, was an insurer admitted to do business in California. On the other hand, the COMPETE Master Trust, should it be an insurer, was a nonadmitted insurer because it was not licensed by the Department of Insurance. Cal.Ins. Code § 700(a). From these materials, CMA frames an argument to the effect that the 01 policy was an illegal attempt by Kennesaw to reinsure that part of the COMPETE Master Trust's liability consisting of claims exceeding $25,000. Snapping the trap shut, CMA insists that by means of section 803 this attempt eliminates the $25,000 threshold from the 01 policy with the result that Kennesaw is liable for all the claims of beneficiaries of the COMPETE program.

Kennesaw defends on the ground that it was not a reinsurer, but rather undertook to provide insurance directly to beneficiaries of the COMPETE program. There is evidence in the record that both supports and undermines this characterization of Kennesaw's contract. Fortunately, we need not resolve this difficult factual issue. Even if the 01 policy was reinsurance, as CMA urges, we hold that CMA's trap is faulty.

CMA explains why section 803 changes the terms of the 01 policy and shifts all of the COMPETE program's liability to Kennesaw in this manner. First, it asserts that the 01 policy contains a clause that amends any terms in conflict with state statutes to conform to those statutes. Second, it continues, California courts will amend insurance contracts to conform to law, even if there is no conformity clause. Finally, CMA argues that section 803 creates a private cause of action.

The first two contentions are but variations on a single theme, "the principle that insurance policies are governed by the statutory and decisional law in force at the time the policy is issued and such provisions are read into each policy issued thereunder and become part of the contract with full binding effect on each party." *Contreras v. America, Compania General de Seguros, S.A.*, 48 Cal.App.3d 270, 275, 121 Cal.Rptr. 694, 695 (1975). The principle is used by California courts to enforce policies of automobile liability insurance as though they were written in accordance with statute, even when the policies contain express language to the contrary. *Id.* at 281–83, 121 Cal.Rptr. at 700–01 (striking terms that excluded coverage to occupants of a motor vehicle and terms that imposed liability limits lower than the statutory minima). Emboldened by this example of legislative and judicial curtailment of contractual power, CMA asks that the $25,000 deductible in the 01 policy be deleted so that Kennesaw will have assumed "the entirety of such insurance of the nonadmitted insurance together with all the liabilities arising therefrom." Imposing this obligation is required by Insurance Code section 803, CMA insists.

We are unpersuaded. We do not believe that the legislative history of section 803 and the organization of the Insurance Code reveal an intention to have the courts enforce section 803 as did *Contreras* with respect to the statute before it. Understanding of section 803 commences

by recognizing that it is part of Article 7, "Restrictions on Underwriting," which sets forth the conditions on which nonadmitted insurers may do business in California. The purpose of the Article 7 is more evident when its form at the time of enactment is considered. *See* 1 E.R. item 4, at 110 (reproducing former California Political Code § 633d). That purpose appears to have been anticompetitive. More specifically, it was to protect admitted insurers from competition with nonadmitted insurers by making it less attractive for the latter to do business in California. This is supported by the fact that when revised in 1969, an assemblyman denounced its "perpetuation of localized advantages." 1 E.R. item 4, at 108–09. The recodification in 1935 did not substitute any other purpose.

■ Thus, the district court is correct when it concludes that the clause of section 803 that provides for assuming all of a nonadmitted insurer's liability is "permissive, not mandatory." 3 E.R. item 36, at 4. While the purpose of section 803 is to make it more difficult for a nonadmitted insurer to do business in California, an admitted insurer, by assuming the whole of the liability of the nonadmitted insurer, may open slightly the California door to a nonadmitted insurer. Opening that door is not mandatory. The admitted insurer may do so, but it is not obligated to do so.

This analysis is supported by the fact that the section which follows section 803 prescribes penalties for its willful violation: a fine of up to $1000, or suspension of the insurer's certificate of authority. Cal.Ins. Code § 804. Had the Legislature intended that compliance with section 803 be imposed automatically, it would not have been necessary to prescribe a penalty for its violation. To have done so would reflect an avenging spirit not often found in anticompetitive legislation.

■ CMA's private right of action theory is also flawed. California courts will imply a private right of action in accordance with Restatement (Second) of Torts § 874A. *Middlesex Ins. Co. v. Mann,* 124 Cal.App.3d 558, 570–71, 177 Cal.Rptr. 495,

503 (1981). Three parts of that test are relevant to this case. The legislative provision must protect a class of persons; the civil remedy must further the legislative purpose; and the civil remedy must be necessary to assure the effectiveness of the provision.

As explained above, section 803 aims at protecting admitted insurers, not entities like those that CMA represents. CMA disputes this interpretation and attempts to treat the section as consumer legislation. It insists that the purpose of section 803 is to protect insureds. Only by being entirely reinsured by an admitted insurer can a nonadmitted insurer be deemed financially dependable. Only on these conditions can it be permitted to do business in California. But CMA adduces no legislative history or statutory analysis to support this view, and we are unpersuaded.

■ Our view of the purpose of section 803 also negates the second and third parts of the tripartite test. Increasing the liability exposure of admitted insurers will not further the legislative purpose of protecting them. Nor is permitting suits against admitted insurers necessary to assure the effectiveness of section 803; section 804's penalties are adequate to serve that objective. Thus, CMA has failed to show that the private right of action it seeks would promote a public policy. *See Middlesex,* 124 Cal.App.3d at 570–71, 177 Cal.Rptr. at 503. It is worth noting that in the sixty-three years since the Legislature enacted section 803's predecessor, no court has used it to impose civil liability. CMA has not provided this court sufficient reason to be the first.

## V.

### THE ERISA CLAIM

We cannot be as positive about CMA's ERISA claim. The district court initially denied Kennesaw's motion for summary judgment on CMA's ERISA claim, 3 E.R. item 22, at 10, 13, but it reversed itself in response to Kennesaw's motion for reconsideration, 3 E.R. item 41. We come to rest supporting the initial position of the district court. That court ultimately con-

cluded that neither COMPETE nor the smaller trusts composing it were ERISA plans. It found that Kennesaw was not an ERISA fiduciary because it did not have enough discretionary authority. It also queried whether, if there were any ERISA plans, CMA would have standing to sue. We conclude, however, that the state of the record precludes summary judgment.

### A. *Was there an ERISA plan?*

■ We acknowledge that neither COMPETE nor the COMPETE Master Trust was an ERISA plan. An ERISA plan must be "established or maintained by an employer or by an employee organization, or by both." 29 U.S.C. § 1002(1). No employee organization is involved here. Nor is COMPETE or the COMPETE Master Trust an employer with respect to the beneficiaries of the COMPETE plan. It is true that COMPETE's members were all employers, and that the Department of Labor will recognize an ERISA plan established by a "cognizable group or association of employers" if there is some "organizational relationship" among them. *See* Dep't of Labor Op. 79–41 A (June 29, 1979) (LEXIS, Labor library, ERISA file [Available on WESTLAW, FLB–ERISA database.]). But CMA appears to concede that COMPETE recruited heterogenous, unrelated employers. It follows that neither COMPETE nor the COMPETE Master Trust is itself an ERISA plan. To this extent we agree with the district court.

■ Our unwillingness to agree completely with its position that no ERISA plan existed has a different source. The COMPETE Master Trust Agreement provided for participation by "Correspondent Trusts," whose members would be in the same line of business and geographical area. 1 E.R. item 1, at 64–65 (Declaration of Trust § 2.06). These correspondent trusts, which potentially could qualify as ERISA plans, suggest hesitancy in adopting the district court's position. In addition, both Kennesaw's 01 policy and its original 02 policy had nine different page ones, each naming a subtrust restricted to a particular industry. 1 E.R. item 1, 117–26, 193–202. The subtrusts also potentially could qualify as ERISA plans. Nonetheless, we find no evidence that actual ERISA plans came into existence to fulfill the possibilities left open by the documents.

■ Our initial hesitancy ripens into rejection of the district court's holding upon considering CMA's argument that each employer who subscribed to COMPETE thereby established its own individual ERISA plan. The Department of Labor explicitly leaves open this possibility when it denies ERISA plan status to trusts like the COMPETE Master Trust, in which unrelated employers participate. *E.g.*, Dep't of Labor Ops. 86–08 A (Feb. 3, 1986); 85–42 A (Dec. 16, 1985); 80–40 A (July 9, 1980); 79–41 A (June 29, 1979) (LEXIS, Labor library, ERISA file). An employer, however, can establish an ERISA plan rather easily. Even if an employer does no more than arrange for a "group-type insurance program," it can establish an ERISA plan, unless it is a mere advertiser who makes no contributions on behalf of its employees. 29 C.F.R. § 2510.3–1(j). This possibility should be explored in an appropriate manner before summary judgment is employed. We must remember that the existence of an ERISA plan is a question of fact, to be answered in the light of all the surrounding circumstances from the point of view of a reasonable person. *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc).

### B. *Was Kennesaw an ERISA fiduciary?*

Kennesaw, however, must be linked to whatever ERISA plan might exist. This linkage must be that Kennesaw is an ERISA fiduciary.

■ An ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its assets, and anyone having discretionary authority or responsibility in the plan's administration. 29 U.S.C. § 1002(21)(A). Under this broad definition, the COMPETE Master Trust or its Benefits Committee could be fiduciaries to the individual employer ERISA plans. The COMPETE Master Trust collected and disposed of plan

premiums and arranged for the payment of claims. Kennesaw also falls within the definition of a fiduciary if it provided insurance to the individual employer ERISA plans and if the plans provided for "review of and decision upon denied claims by [Kennesaw]." 29 C.F.R. § 2560.503–1(g)(2); *see Moore v. Provident Life & Accident Ins. Co.*, 786 F.2d 922, 927–28 (9th Cir.1986); *McLaughlin v. Connecticut Gen. Life Ins. Co.*, 565 F.Supp. 434, 441 (N.D.Cal.1983); *Eversole v. Metropolitan Life Ins. Co.*, 500 F.Supp. 1162, 1166 (C.D.Cal.1980). Kennesaw appears to have had this power under both the 01 and 02 policies. It arranged for Far West to administer both policies, but it retained the power to supervise Far West closely. 2 E.R. item 7, exhibit U. Certainly the record contains enough evidence of Kennesaw's discretionary authority to survive a motion for summary judgment on this issue.

C. *Does CMA have standing to sue Kennesaw?*

The fact that both CMA and Kennesaw could be ERISA fiduciaries provides CMA's standing to sue Kennesaw. Any fiduciary may bring a civil action against another fiduciary for breach of fiduciary duty. 29 U.S.C. §§ 1109, 1132(a)(2).

D. *Did Kennesaw breach its fiduciary duty?*

Finally, to state a claim for relief, CMA must also prove that Kennesaw breached its fiduciary duty. *See Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir.1985) (per curiam). Kennesaw contends that it has fulfilled the letter of its obligations under both the 01 and the 02 policies. Even if this were true, it is not a complete defense to the charge that Kennesaw breached its fiduciary duty to the individual ERISA plans. In particular, Kennesaw could be liable under a section of ERISA that makes fiduciaries responsible for breaches of fiduciary duty by their cofiduciaries in certain circumstances. 29 U.S.C. § 1105. It appears likely that the COMPETE Master Trust or its associates breached their fiduciary duties to the individual employer ERISA plans, and Kennesaw also might be liable for the consequences. The certificates of insurance issued by the COMPETE program explicitly referred to ERISA rights and privileges, 1 E.R. item 1, at 502, which put Kennesaw on notice that ERISA might apply.

We cannot hold as a matter of law on this record that Kennesaw is without fiduciary liability under ERISA. In so holding, we recognize that further development of the facts may reveal a break in one or more of the links of the chain that ensures Kennesaw's liability. We also recognize that CMA's effort to fix liability against a solvent Kennesaw in no way exonerates the entities for which it is a receiver from grievous fault. Kennesaw's liability, should it exist, serves the ends of justice by protecting employees, not COMPETE and its associated entities.

We reverse summary judgment on the ERISA claim and affirm in all other respects. Each side will bear its own costs.

REVERSED IN PART AND AFFIRMED IN PART.