ROBERT L. FULLERTON AND CORINNE BENNETT, PETITIONERS, v. THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF WASHOE, AND THE HONORABLE JAMES A. STONE, DISTRICT JUDGE, RESPONDENTS, AND MATTHEW Q. CALLISTER, RECEIVER, AND ZIPNUT, INC., A NEVADA CORPORATION, REAL PARTIES IN INTEREST.

No. 26078

March 30, 1995                                    892 P.2d 935

*Mortimer, Sourwine, Mousel & Sloane, Ltd.,* Reno, for Petitioners.

*Jeffrey Dickerson,* Reno; *Callister & Reynolds,* Las Vegas; *Laxalt & Nomura* and *Katherine J. MacKenzie,* Reno, for Real Parties in Interest.

## OPINION

*Per Curiam:*

This original petition for a writ of prohibition, or, in the alternative, a writ of certiorari, challenges the Second Judicial District Court's jurisdiction to enter an order requiring petitioners to divest themselves of patent rights, to sell their stock in a corporation and to release any claims against the corporation. We conclude that the district court lacks authority to order the proposed sale of petitioners' property and therefore grant the petition for a writ of prohibition.

### FACTS

Petitioner Robert L. Fullerton has developed the "Zip Nut," which allows any threaded device to be "pushed" on and then to engage and hold as a regular nut or coupling. In 1988, Fullerton allegedly solicited investors to purchase stock in First Phoenix, Inc., a Nevada Corporation which purportedly had rights to the Zip Nut patent. On September 5, 1991, the state filed, in the Second Judicial District Court, an action against First Phoenix, Crescent Products (dba Fullerton Design), ZipNut, Inc. ("ZNI"), and Fullerton, both individually and dba Fullerton Design. In its complaint, the state asserted that the defendants had violated the Nevada Uniform Securities Act ("Securities

Act''). More specifically, the state alleged that Fullerton had sold unregistered First Phoenix shares to approximately 103 people, that the defendants had unlawfully transacted business as broker-dealers or sales representatives, and that the defendants had committed fraud in the offer and sale of securities. The state sought, among other things, the appointment of a receiver and an injunction prohibiting the defendants from further violating the Securities Act. The state moved for a temporary restraining order, the appointment of a receiver, and a preliminary injunction. The district court granted the requested temporary restraining order and appointed Matthew Q. Callister as temporary receiver for all of the defendants.

Petitioner Corinne Bennett was not named in the original complaint. She and Fullerton have lived together for a number of years, and, according to the state, Bennett was heavily involved in the defendant corporations and in selling the First Phoenix stock. The district court subsequently ordered the state to add Bennett as a defendant and placed her assets under the receiver's control.

On September 17, 1991, the district court granted the state a preliminary injunction which restrained Fullerton and the corporate defendants from violating or conspiring to violate the Securities Act. The district court's September 17, 1991 order also converted Callister's position from temporary receiver to receiver, with the authority to take possession and control of the corporations' assets and books and to hold and administer these assets and books to ensure against their loss, damage or dissipation. Neither Fullerton nor the defendant corporations appealed from this order.

Subsequently, a settlement was proposed; under this proposal, First Phoenix and Crescent Products would be merged into ZNI, and the First Phoenix shareholders would exchange their First Phoenix shares for ZNI shares or senior notes. Fullerton, under the receiver's supervision, would license his patent rights to ZNI for the development, manufacture and sale of the Zip Nut in exchange for a five percent royalty. Additionally, Fullerton would receive 9,250,000 shares of ZNI's authorized 13,500,000 shares, but his shares would be restricted so that he could elect only a minority of directors.[1] Finally, Bennett would receive 1,000,000 shares of unrestricted ZNI stock.

On October 24, 1991, after a hearing regarding the proposed settlement and with the approval of the parties and Callister, the

---

[1]Fullerton's authority was ostensibly limited under the settlement because of his prior problems in managing his corporate ventures. At various times, the district court has opined that Fullerton is merely a bad business person, not a crook.

district court entered a consent order. This consent order released ZNI from the receivership, so that it could reorganize and merge under new management. In addition, the consent order dismissed the state's complaint against ZNI without prejudice.

On November 7, 1991, the district court held another hearing and further considered the settlement proposal. During this hearing, the district court stated that the ZNI shares belonging to Fullerton and Bennett would be subject to receivership until ZNI "was up, and running well." Subsequently, on November 15, 1991, the court entered a second consent order which approved the settlement proposal. This consent order discharged Callister as receiver for First Phoenix and Crescent Products upon their merger into ZNI and dismissed the state's complaint against the remaining corporate defendants. In addition, the consent order required Fullerton and Bennett to obtain approval from Callister on any vote of their ZNI shares, directed Fullerton to obtain Callister's approval before assigning, transferring or licensing his patent rights, and ordered Callister to continue as receiver for Fullerton and Bennett. John T. Schell, III, who had been co-counsel for the defendants, subsequently became the president and a director of ZNI.

On March 15, 1993, Bennett and Fullerton filed a motion to terminate the receivership; this motion was denied. Bennett and Fullerton then appealed from the district court's order denying their motion, and, on March 31, 1994, this court dismissed their appeal. In our order, we explained that the purpose of the continued receivership was to maintain control of Fullerton's patent rights until a licensing agreement was executed and to control the ZNI voting shares owned by Bennett and Fullerton until ZNI was "up and running well." At the time of the appeal, Fullerton and ZNI had not entered into a licensing agreement and Callister's continued control over the ZNI shares owned by Fullerton and Bennett appeared necessary. Thus, we concluded that the district court's order denying the motion was proper.[2]

According to Callister, by early 1994, ZNI "was on the verge of achieving substantial market penetration" but was cash poor. By early April, 1994, ZNI's debenture obligations were substantially in default, it was in arrears on its plant and equipment lease obligations, and key employees were unpaid. ZNI's management actively sought outside investors, as eviction and equipment repossession would end production activity, and foreclosure by the debenture holders would result in the loss of ZNI's assets.

On April 22, 1994, Callister was notified that SpaceVest, a

---

[2]According to Fullerton, he and ZNI still have not entered into a written licensing agreement.

venture capital firm, had executed a commitment letter for a $2,000,000 investment into ZNI. The SpaceVest offer, however, was conditional—in exchange for its cash investment, SpaceVest required the following: (1) that the debenture holders relinquish their creditor positions and collateral claims on ZNI's corporate assets and convert their debentures to common stock; (2) that the ZNI shares owned by Fullerton and Bennett be redeemed by ZNI and that Fullerton's patent rights be assigned to ZNI in exchange for a cash payment to Fullerton of approximately $77,000 and a three percent royalty on future Zip Nut sales; and (3) that Fullerton and Bennett agree to waive all claims against ZNI.

Callister notified Fullerton and his counsel of the SpaceVest offer and requested an emergency hearing, apparently at the request of ZNI. At this hearing, which was conducted on April 29, 1994, Callister informed the district court that the SpaceVest investment was vital to ZNI's survival. Callister also explained that he wanted to determine if Fullerton was interested in the offer. The debenture holders and Nevada investors (represented by the Nevada Securities Division) thought that the offer should be seriously considered. The district court agreed that the offer should be contemplated but requested that more information be provided. Accordingly, the district court ordered counsel for ZNI to provide all parties with full details of the offer and continued the hearing until May 6, 1994.

On May 5, 1994, counsel for ZNI submitted a packet of pertinent information to all parties. On the next day, the parties reconvened for the continued hearing. At the hearing, Callister remarked that the receivership was unusual in that Fullerton was certain that Callister did not have Fullerton's best interests at heart. Callister also explained that ZNI was in an extremely precarious financial position and that ZNI's income had never exceeded its expenses because most of the expenses were development expenses. According to Callister, Fullerton's immediate revenue from royalties after the SpaceVest transaction would be approximately $3,000 to $5,000 per month. When asked what would happen to ZNI if the SpaceVest transaction did not go through, Callister opined that ZNI would not go into bankruptcy but that instead there would be a takeover unfavorable to the debenture holders that would "eliminate every asset that [the debenture holders and stockholders] think they have."

ZNI's president (Schell), on the other hand, testified that if the SpaceVest transaction did not go through, ZNI would have to file for bankruptcy protection. Schell also stated that "as a legal matter" ZNI had been insolvent for some time, but explained on cross-examination that ZNI has never been insolvent by an "accounting determination." According to Schell, SpaceVest

would require, for the transaction to close, the retirement of all stock owned by Fullerton, Bennett, and Michael Fullerton.[3] Schell also stated that SpaceVest wanted to ensure that no further shareholder disputes would occur and therefore would want ZNI to "buy out" its shareholders. Schell further revealed that pursuant to the SpaceVest arrangement, ZNI's management would acquire twenty percent of the ZNI stock.

According to Schell, the stock transferred to ZNI from Fullerton and Bennett would go into the ZNI treasury and either remain there or be reissued to SpaceVest. Schell admitted that ZNI already owes Fullerton approximately $77,000 in consulting fees and royalties pursuant to the consent order previously entered by the district court, and that Fullerton has not been paid any part of this sum. Schell further admitted that under the SpaceVest offer, Fullerton would receive only what ZNI already owes him, and would also receive a smaller royalty than that to which he is currently entitled under the consent order.

Schell also testified that the outstanding debentures were convertible into stock at fifty cents a share; under this calculation, Fullerton's 9,250,000 shares would be worth $4,625,000 and Bennett's 1,000,000 shares would be worth $500,000. However, Schell explained that the debenture holders did not have to convert unless the debentures were *worth* fifty cents a share (which they were not), and that therefore, the shares owned by Fullerton and Bennett were not actually worth much money.

Fullerton's counsel vehemently objected to the SpaceVest offer, primarily on the grounds that Fullerton would merely be paid what ZNI already owes him, that Fullerton would receive only a three percent royalty instead of the five percent royalty to which he is currently entitled, and that Fullerton would have to waive potentially viable legal claims. Bennett objected to the SpaceVest offer on the ground that she would be paid nothing for her 1,000,000 shares of ZNI stock. Schell admitted that Bennett would receive nothing for her shares, and the district court instructed Bennett that she and Fullerton would have to decide between themselves how much of the payment and royalties she would receive.

Callister then explained to the district court that in his view, he was not asking for a divesture, but instead, a "winding down" and sale of assets "just like in every other receivership . . . so that [there is] a chance for reimbursement." According to

---

[3]Apparently, Michael Fullerton is Robert Fullerton's relative. In response to the district court's observation that it has no jurisdiction over Michael Fullerton's ZNI shares, Schell stated that SpaceVest would attempt to negotiate with Michael Fullerton.

Callister, Fullerton owes more than $15,000 in receiver's fees and arbitration fees, and the "sale" of his ZNI stock will pay these fees.

The district court then concluded that without the SpaceVest capital infusion, ZNI would not become a defunct corporation, but that the shareholders would probably lose their investment. At the conclusion of the hearing, the district court approved ZNI's acceptance of the SpaceVest offer, with three conditions: (1) the court had to be satisfied with SpaceVest's financial viability; (2) the final closing documents had to conform with the proposed investment; and (3) SpaceVest had to guarantee protection of Fullerton's future royalty rights. Apparently, Judge Stone felt a great deal of pressure to reach a quick decision—at the hearing, he stated that "I need to make a decision today. I am advised that if I don't make a decision today, by Monday, this whole thing is in the dumper."

On May 17, 1994, the district court reduced its findings to a written order. In this order, the district court found that ZNI "will likely fail financially without immediate substantial additional equity capital" and that "[t]he proposed equity investment of $2,000,000 by SpaceVest . . . is reasonable and offers the only currently available opportunity for the company to survive and to develop Zip Nut products for the financial benefit of all shareholders." In addition, the court ordered Fullerton and Bennett to

> transfer their stock in [ZNI], free and clear of all liens and their patents, patents pending, trademarks, copyrights, designs and other intellectual property they may still hold related to the Zip Nut invention to [ZNI] in such matter as [ZNI] may require in order to carry out the . . . [SpaceVest transaction] in consideration of the payment of $77,321 and a 3% royalty on all gross sales of products using designs covered by the patents and patents pending heretofore held by Defendant Fullerton. Defendants Fullerton and Bennett may split the royalty income as they see fit to compensate Ms. Bennett for her stock.

The court also ordered Fullerton and Bennett "to release and waive all rights of action they may have against [ZNI], its management, its investors, its shareholders, its debentureholder [sic] and SpaceVest related to the formation, operation and the refinancing of [ZNI]." At this point, the anticipated SpaceVest closing date was May 21, 1994.

On May 20, 1994, Fullerton and Bennett filed petitions for bankruptcy in the United States Bankruptcy Court, and Fullerton listed his ZNI stock and Zip Nut patents as debtor assets. These petitions imposed an automatic stay on the SpaceVest closing, but

were subsequently dismissed. Fullerton then filed an appeal with the bankruptcy appellate panel and sought a stay of the Nevada district court proceedings. On August 11, 1994, the bankruptcy panel denied the request for a stay. Fullerton also filed a civil rights action in federal court against ZNI and Callister; that action is still pending.

After the bankruptcy panel denied Fullerton's stay request, ZNI and Callister planned to close the SpaceVest transaction on September 15, 1994. As a result, Callister filed in the district court a motion to sell, and a hearing was scheduled for September 9, 1994. On September 2, 1994, Callister notified Fullerton of the upcoming district court hearing. According to Callister, SpaceVest advanced $90,000 to ZNI in order to assist in closing fees and costs.

On September 8, 1994, Fullerton and Bennett filed with this court their petition for a writ of prohibition, or in the alternative, a writ of certiorari, and for a stay. On September 9, 1994, we issued an order temporarily staying the district court proceedings. Thereafter, on September 30, 1994, we issued an order staying the district court proceedings pending our resolution of the instant petition.

## DISCUSSION

In their petition, Fullerton and Bennett contend that the district court has exceeded its jurisdiction and that they have been denied their due process rights under the United States and Nevada Constitutions. In particular, petitioners assert that the court has no authority to "confiscate" their property for the benefit of ZNI under the relevant statute, and that the court has ordered their property sold without first holding a trial on the merits.[4]

We conclude that the receiver has exceeded the scope of the receivership and that the district court lacks authority to order the petitioners to transfer their ZNI stock and patent rights to ZNI and to release ZNI and its affiliates from all claims.[5] The relevant statute, NRS 90.640, provides, in pertinent part, as follows:

---

[4]We reject Callister's assertion that the petition is dilatory, taken in bad faith and therefore precluded by the doctrine of laches. Although Fullerton and Bennett chose to pursue bankruptcy proceedings before filing the instant petition, this choice did not constitute "inexcusable delay" or a waiver of rights. See Buckholt v. District Court, 94 Nev. 631, 633, 584 P.2d 672, 674 (1978). Accordingly, the doctrine of laches does not preclude our consideration of this petition.

[5]We therefore do not reach petitioners' due process argument. See Director, Dep't Prisons v. Arndt, 98 Nev. 84, 86, 640 P.2d 1318, 1320 (1982) (noting that "[i]t is well settled that this court will not address constitutional issues unless the[y] are requisite to the disposition of a case").

1.   Upon a showing by the administrator [of the Securities Division] that a person has violated or is about to violate this chapter, or a regulation or order of the administrator under this chapter, the appropriate district court may grant or impose one or more of the following appropriate legal or equitable remedies:

> (a) Upon a showing that a person has violated this chapter, or a regulation or order of the administrator under this chapter, the court may singly or in combination:
>
> . . . .
>
>> (4) Order restitution to investors;
>> (5) Provide for the appointment of a receiver or conservator for the defendant or the defendant's assets;
>>
>> . . . .
>>
>> (7) Order such other relief as the court deems just.

Even assuming that the administrator of the Securities Division has made the required showing that Fullerton and Bennett have violated a regulation or order under NRS Chapter 90, the district court lacks authority to order Fullerton and Bennett to sell their ZNI shares under the proposed terms of the transaction.[6] First, with regard to the court's authority to order restitution under NRS 90.640(4), we note that the district court's prior consent orders were entered to effect a settlement between Fullerton, Bennett and the First Phoenix investors. The district court's May 17, 1994 order, at issue here, does not provide direct restitution to the First Phoenix investors. Although Callister points out that ZNI's success offers the First Phoenix investors an opportunity to recoup their investments, the district court's May 17, 1994 order does not require Fullerton and Bennett to reimburse the First Phoenix investors. Instead, it appears that SpaceVest wishes to "purchase" the shares owned by Fullerton and Bennett. Any ancillary benefit to the First Phoenix investors is simply too remote to constitute "restitution"; thus, the district court's May 17, 1994 order is not authorized under NRS 90.640(4).

We also conclude that the court's May 17, 1994 order is not

---

[6]We note that in its September 17, 1991 order appointing Callister as receiver, the district court did not conclude that Fullerton had violated NRS Chapter 90; instead, it found that a receivership was proper "[g]iven the past actions of [Fullerton] and the seriousness of the charges currently against him." In addition, as Bennett was not a party to the action at the time of the district court's September 17, 1991 order, no finding was made regarding her alleged violations of NRS Chapter 90.

authorized by NRS 90.640(5), which permits the court to provide for the appointment of a receiver.[7] This court has recognized that "a receiver appointed by a court . . . has broad powers." Jones v. Free, 83 Nev. 31, 37, 422 P.2d 551, 554 (1967). Nevertheless, these powers are not limitless. "A receiver's powers are derived from the purpose his appointment serves." Credit Managers Ass'n v. Kennesaw Life & Acc. Ins., 809 F.2d 617, 621 (9th Cir. 1987). Consequently, a receiver must not exceed the limits of the authority granted. See generally 8 Debtor-Creditor Law ¶ 33.02[B], at 33-8 (Matthew Bender 1992). In addition, a receiver must act for the benefit of all persons interested in the property. Shannon v. Sup. Ct., 266 Cal. Rptr. 242 (Ct. App. 1990).

Here, Callister was first appointed, pursuant to NRS 90.640, to preserve the petitioners' property during the pendency of the litigation. After the settlement agreement was approved, Callister's appointment was continued in order to (1) control the Zip Nut patent until a licensing agreement was executed between Fullerton and ZNI and (2) control Fullerton's and Bennett's voting shares until ZNI was "up and running well." Based upon the limited purpose of Callister's continued role as receiver for Fullerton and Bennett, we conclude that Callister has acted beyond the scope of the receivership in attempting to force the "sale" of Fullerton's and Bennett's ZNI shares and Fullerton's patent rights.[8]

---

[7]Callister argues that the district court has the authority to sell assets placed under a receivership and cites Lynn v. Ingalls, 100 Nev. 115, 676 P.2d 797 (1984), and Gottwals v. Manske, 60 Nev. 76, 99 P.2d 645 (1940). Neither of these cases, however, directly supports Callister's contention. In Ingalls, lessors brought an action to terminate a nursing home lease and recover payments that were due. Under the terms of the lease, "a receiver could be appointed to take charge of the nursing home during the pendency of the litigation [and] was authorized to sell the nursing home business in order to pay off existing claims." Ingalls, 100 Nev. at 117, 676 P.2d at 799. This court concluded that "[s]ince the lessor [could] evict the defaulting tenant for failure to pay rent, it [was] allowable under the terms of the lease to permit a receiver's sale which [did] not include the remaining term of the lease." Id. at 119, 676 P.2d at 800. Thus, the receiver's right to sell the business stemmed from the lease; in addition, the receiver was directly reimbursing the lessor through the sale.

In Gottwals, the receiver was required by court order to pay the plaintiff a monthly sum and refused because a writ of attachment had been served on him regarding the receivership property. This court concluded that property in a receivership is not subject to interference without the court's consent, and that therefore, the receiver was in contempt for his failure to pay the plaintiff. Gottwals, 60 Nev. at 84-85, 99 P.2d at 648-49. Gottwals does not stand for the proposition that a district court has discretion to sell assets held in a receivership.

[8]In addition, although we recognize that a primary purpose behind NRS 90.640's authorization of a receivership is to protect investors from losses

Moreover, the district court lacks authority to order such a sale. The district court's consent orders established a reorganization plan, pursuant to which Fullerton and Bennett received stock in ZNI and Fullerton received a five percent royalty. By ordering Fullerton and Bennett to sell their ZNI shares for less than what is already owed them by ZNI, the district court is effectively attempting to abrogate the parties' settlement agreement. Although a district court may order a receiver's sale to pay creditors and to wind up an insolvent's affairs, *see, e.g.,* Davis Trust Co. v. Hardee, 85 F.2d 571 (1936); Hannon v. Mechanics Bldg. & L. Assoc., 180 S.E. 873 (1935), Callister is not purporting to settle with the petitioners' creditors in exchange for the "sale" of the petitioners' stock and patent rights. Instead, it is primarily *ZNI's* creditors whom the cash infusion from SpaceVest will appease.[9]

In addition, the sale of *all* of Fullerton's ZNI stock and patent rights is not justified by Fullerton's alleged $15,000 debt for receivership and arbitration costs—Fullerton's stock and patent rights are worth far more than $15,000, even pursuant to the proposed SpaceVest transaction. Also, as no judgment has been entered against Fullerton and Bennett, the First Phoenix investors are not judgment creditors. Because the "sale" of Fullerton's and Bennett's stock will not be utilized to pay their creditors, for purposes of distribution, or to liquidate and wind up their affairs, a receiver's sale is not warranted.

Furthermore, a court's power to order the sale of property pursuant to an order appointing a receiver is extremely limited:

> [t]he power of the court ordering a sale of property on an interlocutory order appointing a receiver and before final decree is one of an extraordinary character, and should never be exercised except in very plain and unquestionable cases. Indeed, it should plainly appear beyond a reasonable doubt, either by proof or from the very nature of the case itself, that a sale must inevitably be decreed in final hearing to justify the passing of an interlocutory order . . . .

2 Clark on Receivers § 510(a), at 823 (3d ed. 1959). Here, Fullerton is slated to receive *less* than what ZNI already owes him

---

when Nevada securities laws are violated, a receiver must act for the benefit of *all* parties. We cannot conclude, under the present circumstances, that Callister has acted for the benefit of all parties, including Fullerton and Bennett.

[9]The documents submitted to this court do not contain any allegations that Fullerton and Bennett are ZNI's "alter ego" and that therefore, Fullerton's and Bennett's assets should be used to pay ZNI's creditors.

in exchange for his more than nine million shares, and Bennett will receive *nothing*. The purported "sale price" of these shares thus appears wholly inadequate, and we conclude that this is not a "plain and unquestionable case" necessitating a receiver's sale before final judgment is entered.

Finally, although NRS 90.640(7) authorizes the district court to order any other relief that it deems just under the circumstances, this "catchall" provision does not provide the district court with unfettered discretion to order the sale of Fullerton's and Bennett's ZNI stock. Under these circumstances, ordering Fullerton to exchange his shares for less than what is already owed him and ordering Bennett to exchange her shares for nothing is hardly "just." We therefore conclude that NRS 90.640(7) does not provide the district court with authority to order Fullerton and Bennett to sell their ZNI shares for less than what they are already owed by ZNI under the settlement agreement.

For the reasons stated above, we conclude that the district court lacks authority to order Fullerton and Bennett to sell their ZNI shares and to order Fullerton to sell his patent rights. The district court, by entering its May 17, 1994 order, therefore acted in excess of its jurisdiction. A writ of prohibition may issue to arrest the proceedings of a district court exercising its judicial functions, when such proceedings are in excess of its jurisdiction. NRS 34.320. We grant the petition for a writ of prohibition and direct the clerk of this court to forthwith issue a writ of prohibition precluding the district court from enforcing its May 17, 1994 order.[10]

---

[10]Cause appearing, we grant petitioners' motion for leave to file a reply and direct the clerk of this court to file petitioners' reply, which we received on September 26, 1994. We have considered the reply in resolving this petition. Although the stockholders were not granted permission to file documents in this matter in proper person, *see* NRAP 46(b), we have received and considered their joinder in the receiver's opposition to the petition. We direct the clerk of this court to file the joinder, which was received by this court on September 30, 1994. Finally, in light of this opinion, we deny as moot the emergency motion for expedited determination and for an order conditioning relief upon the filing of a bond filed by real party in interest ZNI.